THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| **KEVIN MAURICE WILLIAMS,** | : | |
| | : | |
| Plaintiff, | : | Civil Action |
| | : | No. 5:05-cv-310 (CAR) |
| v. | : | |
| | : | |
| **MRS. CANTY, Officer,** | : | |
| **MR. YOUNGBERG, Unit Manager,** | : | |
| **DR. FOWLKES, Doctor,** | : | |
| **MS. LANCE, Director of Care and** | : | |
| **Treatment, in their Individual** | : | |
| **Capacities,** | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

### ORDER ON THE REPORT AND RECOMMENDATION OF
### THE UNITED STATES MAGISTRATE JUDGE

This case is before the Court on the Report and Recommendation ("the Recommendation") of the United States Magistrate Judge, who recommends that the Defendants' motion for summary judgment be denied. Defendants have entered their objections to the Recommendation. Upon review of the Recommendation and the objections, and upon *de novo* review of the arguments of the parties and the evidentiary materials on file, this Court agrees with the findings of the Magistrate Judge and finds that there are genuine issues of material fact that preclude summary judgment and require trial of this case on the merits.

Although Plaintiff initially filed this case *pro se*, upon review of Defendants' first motion for summary judgment the Magistrate Judge determined that Plaintiff's claims had sufficient merit and were sufficiently serious to warrant appointment of counsel. Plaintiff's appointed counsel, proceeding *pro bono*, has been notably zealous in the representation of his client and the parties have

1

presented a substantial body of evidence for review on the present motion for summary judgment. Both sides have thoroughly and capably briefed the issues, both on the motion for summary judgment and in response to the Recommendation. Within this record there is ample evidence to support a finding by a reasonable jury that the four Defendants were deliberately indifferent to Plaintiff's serious medical need, and that this deliberate indifference resulted in injury to the Plaintiff. This evidence, interpreted in the light most favorable to Plaintiff, is summarized in the Recommendation.

The central issue in this case is whether Defendants were deliberately indifferent when they decided to move Plaintiff from a lower-bunk assignment in a lower-tier cell to an upper-bunk assignment in an upper-tier cell. At the time of the move, Plaintiff was recovering from recent surgery on his left leg and was under the care of a physician. His lower leg was immobilized in a rigid plastic boot. The move to the upper tier required Plaintiff to walk up and down two flights of stairs several times a day. Shortly after being moved, Plaintiff fell while attempting to climb down the stairs and injured his back.

The undisputed evidence shows that Plaintiff was assigned to "C-House" of the Georgia Diagnostic and Classification Prison following surgery to repair a ruptured achilles tendon, performed on March 16, 2004. C-House is an extension of the prison infirmary reserved for inmates with special medical needs. Plaintiff's surgery was performed by Dr. C. Thomas Hopkins, an independent orthopedist who is not employed by the Department of Corrections. Following the surgery, Dr. Hopkins ordered that Plaintiff be given a wheelchair and that he avoid placing any weight on his injured leg. Upon return to the prison, Plaintiff was given "medical profile" that called for a low-bunk, low-tier cell assignment, in-cell meals, and access to a wheelchair. At a May 16,

2004 follow-up examination, Dr. Hopkins removed Plaintiff's cast and placed his injured leg in a "fracture walker," a hard plastic boot that keeps the injury immobile while permitting the patient a degree of mobility. Dr. Hopkins' May 16 order to the prison provided that Plaintiff be allowed to "bear weight as tolerated with the fracture walker." Hopkins Dep. (Doc. 83), Ex. 3.

Dr. Hopkins has testified that he usually keeps patients non-weight bearing for about three months after surgery. Because Plaintiff was in a prison environment, Dr. Hopkins found it necessary to "over protect." Hopkins Dep., p. 11. Nevertheless, two months after the surgery, Dr. Hopkins determined that Plaintiff could place some weight on the injured leg while wearing the fracture walker. This did not mean, however, that Plaintiff was able to move about freely. As Dr. Hopkins explained, at that stage in his recovery Plaintiff "would not have been allowed to do an excessive amount of walking, climbing, stooping, and things such as that." Id. at 13. In light of these limitations, Dr. Hopkins' order to the prison allowed Plaintiff to bear weight on the leg only "as tolerated." No change was made to Plaintiff's medical profile as a result of the May 16 order.

From the time of the May 16 examination until June 3, Plaintiff continued on his medical profile calling for low bunk, low tier, cell feed, and wheelchair access. On June 3, Dr. Joseph Fowlkes, the infirmary director, notified Betty Lance, the Director of Care and Treatment, that he needed to move a patient from the infirmary to C-House, which would require clearing one of the low bunk, low tier inmates to the upper tier. Lance met with Edward Youngberg, the Unit Manager for C-House, to determine which inmate to move. Youngberg was instructed to find inmates whose low tier profiles had "expired." With the assistance of guard Coby Canty, Youngberg and Lance selected Plaintiff's profile. Canty has testified that Dr. Fowlkes, Lance, and Youngberg met in a "huddle" outside Plaintiff's cell and decided that he had to move.

There is no credible evidence that Plaintiff's profile had in fact expired when the Defendants decided to move him upstairs. The profiles themselves no longer exist. There was no change in Dr. Hopkins' orders after May 16. The Defendants' testimony about their reasons for selecting Plaintiff is inconsistent. Lance first testified that Youngberg and Canty only brought her profiles that had expired, then testified that she felt certain that Plaintiff's profile had expired, then testified that only some of the profiles had expired, then finally testified that a physician's assistant discontinued Plaintiff's profile after Plaintiff had been selected for moving. The prison medical records show that physician's assistant Steve Finderson gave a verbal order to discontinue the low tier, cell feed, wheelchair profile at noon on June 3, 2005. This verbal order was later signed off by Dr. Fowlkes. There is no indication anywhere in the medical records that Plaintiff's profile had been scheduled to expire previous to Finderson's order.

Finderson has testified that the prison staff brought him Plaintiff's profile and asked him to review it because they wanted Plaintiff moved:

> When [Plaintiff's chart] was brought to me and I looked through the chart and they want the guy to be removed . . . from the low tier, self-feed [*sic*], and at that point, looking through the chart, I saw that this fellow had been seen by the orthopaedic surgeon. He was approved to weight bear as tolerated. So, at that point, he could then walk up a flight of stairs, and he didn't need to eat in his cell. So I said, "We can discontinue his low tier, his self-feed and his wheelchair for long distance movement, low bunk only.

Finderson Dep. (Doc. 97), p. 41. Finderson did not conduct any physical examination of Plaintiff or speak with Plaintiff before agreeing to discontinue the profile. Likewise, Dr. Fowlkes did not conduct any physical examination or speak with Plaintiff before signing off on Finderson's order. Based on the inconsistencies between the claims of Defendants that Plaintiff's profile had "expired," and more substantial evidence showing that Plaintiff's profile was in fact only discontinued after

4

Defendants presented it to Finderson for review, a reasonable jury could infer that Defendants are being less than truthful and that Plaintiff was moved in spite of a medical profile that called for a low-tier, cell feed assignment.

A reasonable jury could also infer that in deciding to have Plaintiff's profile discontinued so that he could be moved, Defendants demonstrated deliberate indifference to a serious medical need. To prove deliberate indifference, Plaintiff must first show that the Defendants had subjective knowledge of a risk of serious harm. See McElligot v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). A defendant's subjective knowledge of the risk of serious harm is a question of fact "subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Goebert v. Lee County, 510 F.3d 1312, 1327 (11th Cir. 2007) (quoting Farmer v. Brennan, 511 U.S. 825, 842 (1994)). In this case, a jury could find both that the risk was obvious and that circumstantial evidence raises an inference of knowledge.

An inference of subjective knowledge can be drawn from Defendants' inconsistent testimony, considered in light of Plaintiff's obvious medical condition and Dr. Hopkins' orders concerning Plaintiff. In his May 16 memo to the prison, Dr. Hopkins ordered that Plaintiff was to wear the fracture walker and could only bear weight "as tolerated." This order on its face implies that Plaintiff would only be able to tolerate some weight-bearing, that Plaintiff was not yet ready to resume unrestricted activity. Just eighteen days prior to Defendants' decision to discontinue Plaintiff's profile, Plaintiff had not been permitted to bear any weight at all on the injured leg.

Dr. Fowlkes and Finderson have both acknowledged that the term "as tolerated" in Dr. Hopkins' order would indicate that some inquiry was required into the levels of pain that Plaintiff

experienced when he put weight on the leg. The fact that Plaintiff might have been able to tolerate walking for a few minutes does not automatically mean that he was able to walk around without any limitation, certainly not that he would be able to climb up and down two flights of stairs several times a day. Even though he acknowledged that Dr. Hopkins' order required some inquiry into Plaintiff's ability to tolerate weight on the injured leg and to walk safely, Dr. Fowlkes signed off on the order to move Plaintiff without any inquiry whatsoever. A reasonable jury could find this failure to be indicative of deliberate indifference.

As to Defendants Lance, Youngberg, and Canty, a reasonable jury could make the inference that they were aware of the risk based on the Plaintiff's protests that he was not able to tolerate the amount of weight-bearing required to climb up and down the staircase. There were two flights of metal stairs to the upper tier, a total of approximately thirty steps. An upper-tier, non-cell feed assignment required Plaintiff to descend the stairs several times each day, for meals, showers, and medical attention. When the Defendants informed him of their intent to move him to the upper tier, Plaintiff protested that he was unable to walk up and down the stairs safely in his condition. Plaintiff has testified that Defendants responded to his protests with threats.

A reasonable jury could also determine that the risk of injury was obvious. Plaintiff was recovering from serious surgery and was still under the care of an outside physician. Just over two weeks before the move, Plaintiff had not been permitted to place any weight at all on that leg. At the time Plaintiff was ordered to move, he was wearing a large, rigid boot made of plastic. A reasonable jury could find it obvious that even a healthy person would have a serious risk of falling if forced to walk up and down a thirty-step staircase eight times a day while wearing such a boot.

Defendants' conduct after Plaintiff fell is further evidence indifference. After Plaintiff had taken what another prison guard described as "a tough spill" (Conyers Dep. (Doc. 90 ), p. 11) down the stairs, Plaintiff was taken to medical, where he was seen by a nurse who spoke to physician by telephone. The nurse gave Plaintiff two doses of Darvocet and ordered him to meet with a doctor the following Tuesday. Plaintiff has presented evidence that Darvocet is a strong narcotic prescribed for serious pain. After being seen by the nurse, Plaintiff was *returned to his upper-tier cell*, despite the fact that he had just fallen down a flight of stairs and injured himself. He was assigned a top bunk in his cell. Unable to climb into the top bunk, Plaintiff slept on the floor. He awoke the next morning in pain and unable to move. Plaintiff testifies that he called for help, and Defendant Canty eventually responded. Canty refused to help him, but gave him a sick call form. Plaintiff's fall took place on a Friday afternoon, and regular sick call was unavailable over the weekend.

Plaintiff has testified that he remained on the floor of his cell the entire weekend, without food or medical attention. He was finally seen by a physician's assistant on Monday, June 6. The PA prescribed Toradol for pain and issued a profile for Plaintiff to remain in a wheelchair for a week. The following day Dr. Fowlkes issued a profile for Plaintiff to return to his low bunk and low tier assignment. For reasons that have not been fully explained, he was placed in an isolation cell on death row.

Plaintiff has brought claims against Defendant Canty for ignoring his calls for help while he lay in his cell over the weekend. His testimony is that he spent the entire weekend, from Friday evening, June 3, to Monday morning, June 6, lying on the floor, without food and in pain. The Eighth Amendment requires that prisons provide inmates with "the minimal civilized measure of life's necessities." Wilson v. Seiter, 501 U.S. 294, 298 (1991). Among these necessities, naturally,

7

is food.  See, e.g., Berry v. Brady, 192 F.3d 504, 507 (5th Cir. 1999).  Whether the deprivation is sufficient to constitute cruel and unusual punishment "depends on the amount and duration of the deprivation."  Id.  The Eighth Circuit has held that the denial of four consecutive meals over a thirty-two hour period denied an inmate "the minimal civilized measure of life's necessities," and thus constituted cruel and unusual punishment.  Simmons v. Cook, 154 F.3d 805, 808 (8th Cir. 1998).  In this case, a deprivation of food for at least 60 hours, after an inmate has suffered a serious fall, is well below the civilized measure of life's necessities.  Canty's alleged refusal to assist Plaintiff, particularly in light of Plaintiff's injuries and the previous threats that Plaintiff has alleged, would constitute an "unnecessary and wanton infliction of pain" and demonstrate deliberate indifference to Plaintiff's serious medical needs.

The evidence in this case that establishes the Defendants' deliberate indifference, if believed by the finder of fact, does not permit a finding of qualified immunity protecting Defendants.  The Defendants had sufficient notice that their deliberate indifference to a serious risk of injury was a violation of the Eighth Amendment prohibition of cruel and unusual punishment.  "Even in the absence of factually similar case law, an official can have fair warning that his conduct is unconstitutional when the constitutional violation is obvious."  Gray ex. rel. Alexander v. Bostic, 458 F.3d 1295, 1306 (11thCir. 2006).  In this case, it is obvious that forcing an inmate in Plaintiff's condition to walk up and down two flights of steps several times a day exposes him to risk of serious injury, that is, of falling down the steps.  Plaintiff was still recovering from serious surgery, was confined in a hard plastic boot that limited his range of motion, and had only recently been allowed to place any weight at all on the leg.  Orders from Plaintiff's treating physician stated that he was only to place weight on the leg "as tolerated."  Nevertheless, Defendants made no attempt to discern

8

how much weight-bearing Plaintiff could tolerate, and ignored his pleas that he could not walk up and down the stairs safely.  When he did fall, just a few hours later, Defendant Canty assumed that he had faked the fall as revenge against her, and refused to provide him with any food or medical attention.  These actions, viewed in the light most favorable to Plaintiff, are so obviously within the realm of deliberate indifference as to be outside the realm of qualified immunity.

Accordingly, the Report and Recommendation of the United States Magistrate Judge (Doc. 105) is hereby **ADOPTED** and made the Order of the Court.  In accordance with that Recommendation, Defendants' motion for summary judgment is **DENIED**.

**SO ORDERED**, this 25th day of March, 2008.


S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE


chw